CASE 16—PETITION EQUITY—APRIL 7.

## Collins v. Henderson, &c.

APPEAL FROM FRANKLIN CIRCUIT COURT.

1. THE "ACT DIRECTING THE PURCHASE OF COLLINS'S HISTORICAL SKETCHES OF KENTUCKY" relates to but one subject, and that is clearly expressed in the title.

    The particular manner in which the object of an act is to be accomplished need not be expressed in the title.

    The constitution requires only that the title shall indicate with clearness the subject about to be legislated upon, and that the act itself be confined to that subject.

2. THE ACT "IMPOSING AN ADDITIONAL TAX OF FIFTEEN CENTS for the purpose of increasing the common-school fund," and any sum produced thereby, is within the provision of section 1, article 11 of the state constitution, and, as a part of the common-school fund, can only be applied in aid of the common schools.

3. DOUBT AS TO THE CONSTITUTIONALITY OF A LAW MUST BE RESOLVED IN FAVOR OF ITS VALIDITY; but this rule does not require that the constitution should expressly prohibit the passage of the act claimed to be in conflict with it.

    Powers may be implied from such as are granted in words, and the implied powers are as much granted as those expressed. So limitations inconsistent with the exercise of the power claimed may be implied from express limitations.

4. A PROVISION DIRECTING A PARTICULAR THING TO BE DONE IS A LIMITATION upon the power of the legislature to do that which will prevent the doing of the thing directed.

5. WHAT WAS MEANT BY "COMMON SCHOOLS."—At the time of the adoption of the present constitution the common schools to which the school fund was exclusively applied were schools actually taught by teachers qualified according to law to teach, in districts laid out by authority of the school laws, and under the control of trustees elected under those laws, and all white children in the district within a specified age were privileged to attend. All aid for purposes other than to defray the expenses of such schools was strictly withheld.

6. Section 1, article 11 of the constitution, providing that the school fund shall be held inviolate for the purpose of sustaining a system of common schools, and that the interest and dividends thereon, together with any sum which may be produced for that purpose by taxation or otherwise, may be appropriated in aid of common schools, but for no other purpose, intended that such fund should be used exclusively in aid of common schools in the same manner in which the school fund had been previously appropriated.

7. *The act directing the purchase of "Collins's Historical Sketches of Kentucky" is unconstitutional* in so far as it provides for the appropriation of any part of the school fund to that purpose, it not being in aid of common schools within the meaning of the constitution.

8. CONTEMPORANEOUS CONSTRUCTION.—The Revised Statutes, prepared and adopted soon after the present constitution went into effect, in so far as they furnish any evidence as to how the constitution was then understood, must be regarded as a contemporaneous construction.

9. WHERE THE WORDS OF A LAW ARE OBSCURE OR DOUBTFUL, and the sense of the legislature can not with certainty be collected by interpreting the language according to reason and grammatical correctness, considerable stress is laid upon the light in which it was received and held by the contemporary members of the profession.

10. *That no appropriation for the support of normal schools* can be constitutionally made out of the school fund was in substance declared by the adoption of subsec. 3 of sec. 1, art. 1, chap. 88, Revised Statutes.

J. M. COLLINS, . .
R. H. COLLINS, . .
CARLISLE & FOOT,
GEO. C. DRANE, ' .          . . . . . . . . For Appellant,

CITED

Constitution of Kentucky, art. 1, secs. 1, 2; art. 11, sec. 1.
Common School Law, art. 3, sec. 5.
Session Acts, 1836–37, page 321.
Debates on Ky. Con. Conv. 1849, pp. 29, 30, 54, 55, 376, 377. 647, 880 to 901, 910 to 914, 977 to 985, 1088, 1090, 1091, 1101.
Session Acts, 1844–45, pp. 45, 53, 54.
Revised Statutes, 1 Stanton, 319 ; 2 *Ibid.* 327.
General Statutes, pp. 212, 229, 235, 236.
Session Acts, 1846–47, p. 384.          Cooley's Con. Lim. 129.
Act of February 29, 1848.          Acts 1869–70, page 132.
Reports Superintendents of Public Instruction—For 1869, p. 261; for 1871, pp. 6, 7; for 1874, pp. 271, 56, 57, 58.
8 Bush, 108, Smith v. Commonwealth & Cochrane.

1 Session Acts 1871, pp. 102, 103.
1 Bush, 146, Gibson v. Belcher.
2 Metc. 219, Phillips v. Cov. & Cin. Bridge Co.
1 Stephens's Com. 25.        1 Parsons's Cont. 5.
4 Wheat. 197, Sturgis v. Crowninshield.
3 Metc. 257, Hedger v. Rennaker.
4 Met. 294, Berry & Johnson v. Ransdall.
2 Duvall, 20, Griswold v. Hepburn.
9 Bush, 259, Halbert v. Sparks.
9 Dana, 524, City of Lexington v. McQuillan's heirs.
8 Bush, 455, McReynolds v. Smallhouse.
1 Lansing N. Y. 248, People v. Allen.
1 Green (Iowa), 553, Miner's Bank v. U. S., &c.
7 Eng. (Ark.) 321, State v. Curran.
4 Wheat. 316, McCulloch v. Maryland.
6 Mon. 500, Beard v. Smith.
3 Dallas, 400, Colder v. Bull.
9 B. Mon. 295, Gaines v. Gaines.
10 Pet. 18, Dubois v. Hepburn.
11 Pet. 420, Charles River Bridge v. Warren Bridge.
11 Pet. 572, Charles River Bridge v. Warren Bridge.
10 Bush, 604, Cum. & Ohio R. R. Co. v. Barren Co. C't.

JOHN RODMAN, Attorney-General, }
WILLIAM L. JETT, . . . . . . }  . . For Appellees,

CITED

Act directing the purchase of Collins's Historical Sketches
    of Kentucky, Session Acts 1870–71.
General Statutes, chap. 18, art. 1, sec. 4.
9 Bush, 259, Halbert v. Sparks.
4 Metc. 294, Berry v. Ransdall.
7 B. Mon. 108, Morgan v. Lewis.
4 Met. 75, Chiles & Thomas v. Monroe.

JUDGE COFER DELIVERED THE OPINION OF THE COURT.

The first section of an act of the General Assembly entitled
"An act directing the purchase of Collins's Historical Sketches
of Kentucky," which act became a law on the 21st March, 1871,
directed the superintendent of public instruction to purchase of
the appellant, "Richard H. Collins, for the use of this common-
wealth, such number of copies, at the price of four dollars each,

of his new and enlarged edition of Judge Collins's Historical Sketches of Kentucky as shall be sufficient to supply one copy thereof to each common-school district in this state." The second section provided that upon receipt of the books the superintendent should certify to the auditor of public accounts the number received, and directed the auditor to draw his warrant upon the treasury for the price of the same, payable, one half out of the proceeds of the fifteen-cent tax for school purposes levied in 1871, and the other half out of the same tax collected in 1872.

To this section was appended a proviso directing "that if, at the annual election for school trustees, on the first Saturday in April, 1871, any school district should by vote decide *not to purchase said book*, and should certify said vote officially through the county commissioner to the superintendent of public instruction, then said superintendent shall not purchase a copy of said book for said district."

The same section made it the duty of the superintendent of public instruction to notify the commissioners of common schools of the various counties of the passage of the act, and the commissioners were required to notify the trustees of school districts in their respective counties previous to the first Saturday in April.

The superintendent having withheld from the several school districts in Franklin County, where no vote was taken on the question of purchasing the book, the sum of two dollars each out of their share of the school fund for 1871, and a like amount for the year 1872, to pay for one copy of the book for each of the districts in that county, W. L. Jett, the school commissioner for the county, brought his action in the Franklin Circuit Court for a mandamus to compel the superintendent to countersign his draft for the sums so withheld.

Desiring an authoritative settlement of the question raised by the commissioner for Franklin County, the superintendent

brought a suit in equity in the same court against Richard H. Collins and Jett, in which he called upon them to interplead and have the question whether the money should be retained to pay for the books determined by the court.

The superintendent set forth the act, and alleged that it did not go into effect until the 21st of March; that the first Saturday in April was the first day of the month; that it required two days after its passage to prepare and mail to the commissioners of the various counties copies of the act, thus allowing only nine days within which to give notice to the commissioners, and through them to the trustees of the districts; that the whole number of districts in the state at that time was 5,430; that out of this number only 626 voted on the question, and that of those voting all but 33 voted against purchasing the book; and that the 4,804 districts not voting failed to do so for want of sufficient notice of the passage of the act.

He also alleged that the object of the act was to take from the common-school fund about $20,000 for the purchase of a single book, in violation of the state constitution; that the book was in no sense a school-book fit for the use of common schools; and that the General Assembly had no power to buy a book of any kind to be paid for out of the school fund.

By consent of the parties the actions of Jett for a mandamus and of the superintendent against Collins and Jett were consolidated, and the petition of Jett was taken as his answer to the petition of the superintendent, and also as a cross-petition against the superintendent and Collins. Collins was made a defendant to the petition of Jett, and demurred to both petitions; and his demurrer having been overruled, he elected to stand by it; and judgment having been rendered declaring so much of the act as directed payment for the books to be made out of the school fund to be unconstitutional, and awarding a mandamus against the superintendent, as prayed for, Collins has appealed to this court for a reversal of that judgment.

So much of the act as directs the books to be paid for out of the fifteen-cent tax levied and collected for school purposes is claimed to be unconstitutional upon three grounds, viz.:

1. That it is in violation of section 37 of article 2 of the Constitution, which provides that "no law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title."

2. That it was the evident purpose of the legislature to allow a vote in each district upon the question of purchasing the book; and as it so happened that this could not be had, the act is void for the want of the assent of the voters of the several districts.

3. That the act is in violation of section 1 of article 11 of the Constitution.

We will consider these questions in the order in which they have been stated.

1. The act relates to a single subject, and that is clearly expressed in the title. The particular manner in which the object of an act is to be accomplished need not, and indeed can not, be expressed in the title. If the title indicates with clearness the subject about to be legislated upon, and the act itself is confined to that subject, that is all the constitution requires. The act directs the purchase of a book, and that subject is sufficiently expressed in the title, and to designate the fund, out of which it was to be paid for, was directly connected with that subject.

2. Although the act seems to have contemplated a vote by the people of each district, it did not make the purchase depend upon such vote being had, but reversed the usual order in such cases, and directed a copy to be purchased for all districts failing to vote against it.

That it was not intended to make the duty of the superintendent to buy a copy for each district depend upon the vote of the district is not only manifested by the anomalous pro-

visions of the act itself, but by the further fact, not appearing on the face of the law, that in nearly or quite all the cities and in many of the towns in the state no election for trustees was then held on the first Saturday in April.

3. The third ground of objection is more formidable.

Section 1 of article 11 of the present Constitution, after enumerating the several items constituting the common school fund, declares that said sums, "together with any sum which may be hereafter raised in the state by taxation or otherwise for purposes of education, shall be held inviolate for the purpose of sustaining a system of common schools. The interest and dividends on said funds, together with any sum which may be produced for that purpose by taxation or otherwise, may be appropriated in aid of common schools, but for no other purpose."

The tax out of the proceeds of which the books are directed to be paid for was levied under an act entitled, "An act imposing an additional tax of fifteen cents for the purpose of increasing the common-school fund," and any sum produced thereby comes directly within the constitutional provision, and is placed beyond the power of the legislature except to be appropriated in aid of common schools.

That the people, who by a popular vote consented to the tax, and the legislature, by which it was imposed, intended its proceeds to fall under the protection of the constitution as a part of the school fund is not only expressed in the title both of the act submitting the question to a vote and that levying the tax, but in the body of both acts, and that the proceeds of such tax is to be so treated is not questioned.

The sole question presented for decision, then, is whether the appropriation of a part of the money produced by that tax, and dedicated by the constitution to the school fund, to buy a copy of the appellant's book for each school district which failed to vote against such purchase, is in aid of common schools within the meaning of the constitution.

It is insisted for the appellant that the General Assembly, possessing the whole legislative power of the goverment, may appropriate the revenue of the school fund, including the proceeds of taxes levied for educational purposes, for such objects, as it may see proper, provided only that they be not clearly of such a character as will not be in any sense or in any degree in aid of common schools, and that as the legislature has by enacting this provision of the statute decided that the purchase of the appellant's book for the use of the several common schools in the state would be in aid of such schools, the courts can not interfere to defeat the legislative will unless they can decide that the purchase of the book is in no way in aid of common schools.

That as the presumption must always be in favor of the validity of legislative enactments until the contrary is clearly shown, that part of the act in question making the appropriation is valid not only because the legislature has declared that such appropriation is in aid of common schools, but because it is so in fact.

We recognize to its fullest extent the rule that all doubts existing in the mind of the court as to the constitutionality of an act of the legislature must be resolved in favor of its validity, but we do not understand this rule to require that words must be found in the constitution which in express terms prohibit the passage of an act claimed to be in conflict with the organic law.

Powers may be implied from such as are granted in words, and the implied powers are as much granted as those which are expressed. So, on the other hand, limitations inconsistent with the exercise of the power claimed may be implied from express limitations. A provision directing a particular thing to be done is a limitation upon the power of the legislature to do that which will prevent the doing of the thing directed.

The constitution directs the common-school fund, together

VOL. XI.—7

with the interest and dividends thereon, and any sum raised by taxation or otherwise for purposes of education, to be " held inviolate for the purpose of sustaining a system of common schools." This sentence alone, and of itself, would prohibit the legislature from passing any law having the effect to divert that fund from the object to which it was directed to be appropriated. It not only prohibits the diversion of the whole fund by a single act, but it equally prohibits the diversion of any part of it to any other purpose; and then, as if to put the subject forever beyond all dispute or uncertainty, it is declared that the income, including the proceeds of taxes levied for purposes of education, may be appropriated in aid of common schools, *but for no other purpose.*

While this is conceded by the appellant and his learned counsel, they insist that the legislature is the ultimate judge as to what is an appropriation in aid of common schools; or if not, that at least it may appropriate the fund to any purpose not clearly shown not to be in aid of such schools.

The sense intended to be conveyed by the phrases "sustaining a system of common schools," and "in aid of common schools," is not certainly understood from the mere reading of the provisions of the constitution which contain them. The words "common schools" have in themselves no ascertained and definite signification.

It is only by looking into the history of the common-school system in Kentucky that we are enabled to understand what was meant by those words. If we look to the legislation on this subject prior to the adoption of the present constitution we find that a common school was a school taught in a district laid out by authority of the school laws, under the control of trustees elected under those laws, by a teacher qualified according to law to teach. (Secs. 18, 19, and 22 Act 16th of February, 1838, 3 Stat. Laws, 528; sec. 3 Act 1st of March, 1842; *Ibid,* 541 ; secs. 7 and 11 Act 10th of March, 1843, Sess. Acts,

73).    And all the legislation on the subject since the adoption of the constitution has recognized this definition as being correct as far as it goes.

Section 1 of article 8 of chapter 88 of the Revised Statutes, prepared by three of the ablest lawyers in the state, two of· whom had been members of the convention by which the constitution was framed, and one of whom was the author of the first section of article 11, after declaring that the object of that chapter was to carry into effect the intention of the people of the state, as expressed in their constitution, in promoting the establishment throughout the state of a system of common schools, proceeded to declare that every school which was put under the control of trustees and commissioners pursuant to that chapter, and which should be *actually kept* by a qualified teacher, and at which every free white child in the district between the ages· of six and eighteen years should have the privilege of attending, whether contributing any thing toward defraying the expenses thereof or not, *and none other*, should be deemed a common school, or entitled to any contribution out of the school fund.

This definition of a common school, as contained in the report of the commissioners to revise the laws, was assailed by the then superintendent of public instruction, Rev. Robert J. Breckinridge, with all the powers of his great mind, as in contravention of the constitution and a virtual destruction of the common-school system; but the legislature, composed in part of some of the best·lawyers and wisest statesmen in Kentucky, many of whom had been members of the constitutional convention, adopted the statute as reported by the revisers. And the definition of a common school then given has been undeviatingly adhered to ever since, and has been sanctioned by this court as correct.    (Halbert v. Sparks, 9 Bush, 259.)

From the definitions given both before and since the adoption of the constitution, and as far as we know recognized by

all departments of the government as correct, there can be no doubt but that the system of common schools referred to in the constitution was correctly defined by the first section of article 8 (*supra*), and that it is only in aid of that description of schools that the legislature has power to appropriate the school fund, or any part of it, however small.

The phrase "in aid of common schools," like the one we have been considering, has not in itself a certain and definite meaning. There are many modes in which such schools may be aided. Indeed the field within which the legislature might operate to aid common schools in a greater or less degree is almost limitless; and the vital inquiry we are now to make is whether the constitution has limited the modes and manner in which aid is to be afforded out of the school fund, or whether the whole subject is left to legislative discretion, subject only to the limitation or restriction that whatever use is made of that fund must contribute in some degree to aid common schools.

Upon the decision of this question may depend the integrity of the school fund and the safety of the common-school system, now and for more than a quarter of a century one of the favorite and most highly prized institutions in the state.

The words "in aid of common schools" being without defined and exact signification in themselves, and being capable of covering more or less ground, according to the intention of the framers of the constitution, we are to adopt that sense which, without departing from the import of the words, best harmonizes with the scope, object, and design of the provision; and in order to ascertain in what sense the words were used it is necessary to recur again to the history of the subject, and learn from the legislation prior to and at the time of the adoption of the constitution and since that time what was meant by these words.

The educational interest of the state has been productive of a large amount of legislation, and since 1837, when the

foundation of our present system was laid, it has-been subject in some particulars to very many fluctuations; but in regard to the use to be made of the income of the school fund and the proceeds of taxes levied for school purposes there has been no change.

Section 18 of the act of 1838 provided that no district should be entitled to any portion of the school fund until a common school should be organized therein and a school house procured *at the cost of the inhabitants,* and a tax levied which when added to the amount to be received from the state would be sufficient to defray the expenses of the school in said district.

Section 19 of the same act provided that the money received by the districts should only be paid to qualified teachers.

Section 3 of the act of 1842 made the teaching of a school in conformity to the school law a .condition precedent to the receipt of any portion of the income of the school fund, and sections 7 and 11 of the act of the 10th of March, 1843, gave aid to such districts only as organized and maintained a school or schools according to law.

Section 2 of the act of 1845 directed the school fund distributable to the various counties to be used for the benefit of such districts as had organized and kept schools as required by that act. '

An act passed in 1849 recognized this mode of distribution, and further provided that in case any county should neglect for the space of three years to adopt the common-school system and demand the fund set apart to it, the amount so uncalled for should go into the general fund and be invested as principal and for the benefit of all; and an act passed in 1850 provided that districts organizing and causing *schools to be taught* during that year for a term of six months should receive a full proportion of the school fund for 1849 and 1850.

These acts embrace all the legislation respecting the income

of the school fund from the founding of the system in 1838 to the adoption of the constitution, so far as it related to the uses to which the fund was appropriated, and the only use thus designated or permitted to be made was to defray the expenses of a school actually taught, with the single exception that one of the acts made the salary of the superintendent payable out of the school fund.

In view of this uniform restriction of the use of the school fund to defraying the expenses of schools actually taught under the supervision and control of officers of the common schools by teachers legally qualified under the school laws, it would seem that there is little room to doubt that when the framers of the constitution authorized the income of the school fund and the proceeds of taxes levied for purposes of education to be appropriated in aid of common schools, they meant in aid of such schools in the same manner in which that same fund had always been theretofore appropriated, and when they inserted words prohibiting its appropriation for any other purpose they intended to limit the use to the objects to which it had been previously applied.

One of the principal, and often the most efficient, aids in discovering the intention of the law-maker when words of undefined signification are used is the contemporary history of the subject. As we have already seen, aid to common schools had in all statutes prior to the constitution signified aid in defraying the expenses of schools actually taught. The members of the convention must have been acquainted with this fact, and, when they provided for the use of the school fund in aid of common schools, that the same aid theretofore given was intended both by the convention and the people who adopted the constitution seems not only to be a reasonable, but an irresistible conclusion. All aid for purposes other than to defray expenses of schools had always been carefully withheld, and if, it had not been intended to continue to withhold every other

description of aid language could and doubtless would have been used which would have unmistakably indicated the change intended to be made in the objects toward which aid might be extended.

But if, notwithstanding what we have already said, doubt yet remains whether the conclusion reached is correct, there is evidence of its correctness of a most satisfactory character in the construction given to the constitution both by the commissioners appointed to revise the statutes, and the first General Assembly convened after the present constitution went into effect.

As already said, the first section of article 8 of chapter 88 of the Revised Statutes, title "Schools and Seminaries," declared that that chapter was adopted in order to carry into effect the intention of the people, as expressed in the constitution, in promoting the establishment of a system of common schools.

The first subsection of section 1 of article 1 of that chapter required the auditor to apportion, each year, the revenue from the school fund among the several counties according to the number of children within school ages in each. The third subdivision declared the net revenue to be the sum to be distributed, and that whatever expenses might be lawfully incurred by the board of education should be first paid out of the gross fund.

Section 2 of the same article and chapter provided that the revenue of the school fund and the proceeds of all taxes levied in aid thereof should be paid into the treasury, but should never be drawn or appropriated otherwise than pursuant to that chapter in *aid of common schools*. That chapter no where authorized any of the revenue of the school fund or any part of the proceeds of school taxes to be drawn by or appropriated to any district except those in which a common school had been actually kept according to law; and section 3, article 1, made

it the duty of the board of education to transfer the amount
due to any county, but not called for, to the sinking fund, and
directed the governor to execute the bond of the state to the
board of education for the benefit of the counties respectively
for the amounts so transferred.

These provisions show that the constitution was then under-
stood both by the revisers and the legislature to prohibit the
use of the revenue distributable under the school laws for any
other purpose except to defray the expenses of schools actually
kept according to law.    This principle of that chapter was
also opposed by the superintendent in an elaborate and able
report laid before the General Assembly before the Revised
Statutes were adopted.    This circumstance gives additional
evidence that the legislature then understood the provisions
of the constitution to restrict its power over the fund to appro-
priating it to paying for schools actually kept.    This view
then so clearly expressed in the face of vigorous and able op-
position, and, as we must presume, after full discussion, has
been adhered to ever since, except in the single instance now
under consideration, and in the act referred to in Halbert v.
Sparks (9 Bush, 259), which this court declared to be uncon-
stitutional and void.

There are other considerations which tend still further to
support this conclusion.    The principal of the school fund had
been more than once seriously imperiled by the action of the
legislature; the bonds of the state held by the board of edu-
cation had been ordered to be surrendered to the governor,
who was directed to burn them in the presence of the auditor
and secretary of state.    It had been maintained upon the floor
of the convention that the money due from the state to the
board of education was not a debt which the state was bound
to pay, and in making constitutional provision for a sinking
fund for the ultimate payment of the public debt earnest efforts
were made to exclude the school debt from the benefits of that

fund.    The friends of popular education on the floor of the convention openly proclaimed their purpose to be to put the fund beyond the power of the legislature, and to re-dedicate it to its original object.    Yet if the construction contended for by the appellant is to prevail, the anxiety and the zealous labors of the friends of common schools culminated in almost nothing.    If the General Assembly may appropriate the revenue of the school fund for any purpose which can not be clearly shown not to be in aid of common schools in any sense or in any degree, the whole fund may be dissipated and lost to the children of the state whenever the legislature so wills it.

If the appellant's book may be paid for out of the fifteen-cent tax levied for school purposes without a violation of the constitution, then there are almost innumerable objects equally in aid of common schools to which the fund may be appropriated with equal legality.    School houses, school-house furniture, fuel, books, paper, and the like, if furnished, would be equally in aid of common schools, and might be purchased and paid for out of the school fund upon the same ground.

Teachers are indispensable to schools, and it could not be said that an appropriation out of the school fund to pay for educating persons for that vocation was not in aid of common schools.    Indeed, some of the ablest as well as the most zealous friends of popular education have maintained, that the organization of normal schools under a system which would offer gratuitous instruction in such schools to a limited number of common-school pupils as a reward for proficiency and good conduct would not only aid common schools by providing teachers, but also by affording an incentive to pupils to greater industry in mastering the branches taught in the primary schools.    Yet that no such appropriation can be constitutionally made out of the revenue of the school fund was in substance declared by the adoption of the following clause in subsection 3 of section 1, article 1, chapter 88 of the Revised

Statutes: "No part of said income shall be expended by the establishment of any school or seminary other than common schools in each county."

The present common-school laws provide for the organization of teachers' institutes in each county. These are supposed to be and doubtless are beneficial to the common-school system, and the expenses of holding them might not only be paid for out of the school fund upon appellant's theory, but if the legislature so wills teachers might be paid for their services while so engaged, and district and state institutes might in like manner be provided and paid for.

If one book for each district may be purchased, why may not one be purchased for each pupil? And if one or many copies can be so purchased, why not an indefinite number? It is no answer to this argument to say that the legislature must be presumed to act with a view to the best interest of the school system, and that there can not be any well-grounded apprehension that it will misappropriate the fund in the manner indicated. We institute no inquiry into the wisdom or providence of the legislature—we have neither the right nor inclination to do so. The question before us is whether the appropriation in question is in violation of the constitution, and not as to the inherent propriety of the act. We have cited these illustrations, not to show that the legislature will be either reckless or unwise, but for the purpose of proving by them, that under the construction contended for, the constitutional provision, which was clearly intended to place important limitations upon the legislative department, would be frittered away by construction until it could answer no valuable purpose in preserving to posterity the blessings of a cheap and certain common-school education.

If it be once conceded that an appropriation like this may be sustained on the ground that it is in some degree beneficial to, and is, therefore, in aid of common schools, then the number

and amount of such appropriations will be limited only by the discretion of the legislature, and if it so wills, the whole fund may be diverted from the purpose to which it was solemnly dedicated, or rather re-dedicated, by the constitution, and the constitutional provision prove a mere *brutum fulmen.* We must therefore hold, that the appropriation to pay for the appellant's book is unconstitutional, or establish a precedent which practically destroys the limitation attempted to be placed upon the power of the General Assembly over the school fund. To such a construction fraught with such consequences we can not yield our assent so long as we are bound to maintain the constitution as the supreme law.

As we concur with the circuit court in the opinion that so much of the act in question as directs payment for the books directed to be purchased of the appellant for the several school districts in this state to be made out of the proceeds of a tax levied for common school purposes is unconstitutional, the judgment is affirmed.

To THE PETITION OF COUNSEL FOR APPELLANT FOR A REHEARING, JUDGE COFER DELIVERED THE FOLLOWING RESPONSE OF THE COURT:

We have carefully considered the elaborate, able, and earnest petition of the appellant for a rehearing, and have re-examined our opinion already rendered, deeply impressed with the importance of the question decided, and the delicacy of the task which we were called upon to perform, but we have been unable to come to any other conclusion than that already announced.

One of the principal objections taken to the line of argument by which we reached the conclusion that the act in question is unconstitutional is, that we give prominence to the construction placed by the commissioners who framed the Revised Statutes, and the General Assembly by which those statutes were adopted, upon that portion of the constitution with which the act in question was held to be in conflict.

Counsel say this is an unusual course of reasoning; that if it proves any thing it proves too much; that if an act of one legislature can be proved to be unconstitutional by an act passed by another, the conflicting acts would destroy each other and the argument would prove nothing. This would be true if both legislatures occupied the same relation to the subject legislated upon, and had equal means of judging correctly. But such is not the case; and therefore, while we must assume that the legislature of 1851-2, and that of 1871 were in all respects equal both in power and in ability to interpret the constitution, we are bound by a well-settled rule of law to give greater weight to the opinion of the former than of the latter as to the correct interpretation of the constitution.

The constitution went into effect in 1850, and the revised statutes were prepared after the constitution was adopted, and were passed in 1851. So far as these statutes furnish any evidence as to how the constitution was then understood, it must be regarded as a contemporaneous construction, which is always more persuasive than a construction given at a period more remote. Contemporaneous construction is regarded as the best, and is entitled to great weight, because the persons who gave it are supposed to have been better able to determine the intention, not only by the ordinary rules of construction, but especially from knowing the circumstances to which it had relation; and where the words of an act are obscure or doubtful, and where the sense of the legislature can not with certainty be collected by interpreting the language of the statute according to reason and grammatical correctness, considerable stress is laid upon the light in which it was received and held by the contemporary members of the profession. (Broom's Maxims, p. 655-6; 3 Coke, 7; 2 Bouvier's Law Dict. 121.)

Sir Edward Coke says great regard ought, in construing a statute, to be paid to the construction which the sages of the law who lived about the time or soon after it was made put

upon it, because they were best able to judge of the intention of the makers at the time when the law was made.　(3 Inst. 11, 136, 181.)

The men who framed the Revised Statutes were contemporaneous with the constitution, and a part of them aided in making it; the legislature by which the statutes were adopted was in part made up of members of the convention; the debates in the convention, and before the people while the constitution was pending before them for adoption, were fresh in the minds of all, and it is reasonable to say that as they had peculiar opportunities to know with what intention the clause in question was inserted, that what it was intended to mean was more fully understood by them than it can be by us at this distance of time.　A construction so given ought to be decisive of any doubt which might otherwise exist, and it was for the purpose of fortifying our conclusion that we referred to the construction given to this part of the constitution by the commissioners to revise the statutes and the General Assembly of 1851–2.

Another objection taken is in substance that we have undertaken to prove that the power claimed did not exist, because if it existed it might be abused.

We referred to some of the objects to which the school fund might be appropriated, if the act in question is constitutional, in order to show that the limitation imposed, limiting the appropriation of the fund to the aid of common schools, would prove of no value whatever if the construction contended for by the appellant was to prevail, and therefore that such construction was not the true one.　We were bound to assume that the limitation was inserted for some beneficial purpose, and to restrict the power which the legislature would otherwise have had over the fund; and we undertook to show that if it went no further than the appellant claimed, it would not answer any such purpose, but would amount practically to nothing.

We did not decide, as counsel seems to suppose, that the fund could only be appropriated to pay teachers, but said more than once that its use was limited to paying the expenses of schools actually taught under the common-school laws; to what items of such expense it could be constitutionally applied we did not undertake to say.

The fact that the proceedings of the convention seemed to look to the establishment of a system of common schools does not prove that no such system was then in existence. The contrary is true. What was meant was that it should be engrafted in the constitution and be thereby relieved from the mutations incident to uncontrolled legislative action.

Every attempt made in the convention to introduce such phrases as "a general system of education," or "to effect the objects of general education," was defeated, no doubt because such expressions would have made the objects to which the fund might be applied too uncertain. In the very first proposition introduced, the words "in aid of common schools" appeared, and in that proposition the common school intended was defined to be "for the equal benefit of all the children in the commonwealth whose instruction should be provided for by law," and this clause, although omitted from the constitution, was inserted almost *verbatim* in the Revised Statutes, showing what sort of school was then understood to be referred to by the name of common schools, and that it was in aid of such schools, and for no other purpose, that the fund was authorized to be appropriated.

The petition must be overruled.