## Bosworth, Auditor v. State University, et al.

(Decided October 27, 1915.)

### Appeal from Franklin Circuit Court.

1.   Statutes—Title of Act Must Express  Subject Matter of Act—
     Purpose of Constitutional Law.—The purpose of Section 51 of
     the Constitution is to enable persons reading the title of an

act to get a general idea of what the act contains; therefore, under the authority of this constitutional provision, members of the General Assembly and others interested in legislation, have the right to rely on the title as indicating the subject matter of the act and to assume that the act contains no legislation that is not, in a general way, embraced by the subject expressed in the title.

2. Statutes—Title of Act—When Insufficient.—Where an act, the title of which is: "An Act for preventing the manufacture and sale of adulterated or misbranded foods, drugs, medicines and liquors; and providing penalties for violations thereof," contains a single section, embracing fourteen sub-sections, one of which, the eleventh sub-section, provides for the payment to the Agricultural Experiment Station of $7.50 for each analysis of any sample of food or drug made by its director; also for the payment of expenses incurred by it for expert witnesses attending grand juries and courts, clerk hire and all other expenses for carrying out the provisions of the act, the total expense not to exceed in any one year $30,000.00, to be paid out of the State Treasury, such sub-section is violative of Section 51 of the Constitution, as neither the expenditures nor appropriation authorized thereby can be said to be embraced by the subject expressed in the title of the act.

3. Statutes—Subject Foreign to Title—Effect of Introducing Into Body of Act.—When a subject foreign to that expressed in the title, is introduced in the body of an act, if it is so separate and distinct from the remainder of the subject matter of the legislation that it may be omitted without affecting the otherwise valid portions, then the unconstitutional part will be eliminated and the remainder permitted to stand.

JAMES GARNETT, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellant.

J. R. BUSH for appellees.

OPINION OF THE COURT BY JUDGE SETTLE—Reversing.

The appellee, State University, suing for the benefit of the Kentucky Agricultural Experiment Station, and the latter in its own behalf, by petition filed in the Franklin Circuit Court against the appellant H. M. Bosworth, Auditor of Public Accounts of Kentucky, prayed that that officer be required by writ of mandamus to issue his warrant on the Treasurer of the State for the payment to appellees of $8,460.56, the amount alleged to be due the Agricultural Experiment Station for 1,435 analyses of food and drug products at $7.50 each, made by it under Section 1905a, Kentucky Statutes, during the year 1914.

The entire claim presented for the 1,435 analyses in question was $10,762.50, but as $2,301.94 of the amount had been paid by the treasurer upon a warrant from the auditor, there remained unpaid the $8,460.56 mentioned, which the auditor refused to pay.

It is alleged in the petition that it is the purpose of appellees to expend this $8,460.56 in constructing and equipping, on the State University grounds at Lexington, Kentucky, a cold storage plant and abattoir for the use of the Experiment Station, and that they had, in fact, contracted to have the work done at that price.

The auditor filed a general demurrer to the petition upon the grounds: (1) That the act under which the analyses were made by the Agricultural Experiment Station, or so much thereof as authorized the work and attempted to make an appropriation therefor, is unconstitutional, and, therefore, void; (2) That if constitutional, the act does not authorize the use of the money claimed by appellees for the constructing or equipping of a cold storage plant or abattoir upon the University grounds or elsewhere. The circuit court overruled the demurrer, to which appellant excepted. He thereupon filed an answer which, in addition to attacking the constitutionality of the act, and denying the right of appellees to expend the amount in controversy in constructing a cold storage plant and abattoir, denied the necessity for such plant or abattoir and also denied the authority of appellees to construct it at all at the expense of the State, or that they had contracted to have the work done at the price of $8,460.56 or any other sum. The affirmative matter of the answer was controverted of record.

After the taking of depositions and submission of the case, the circuit court adjudged the appellees entitled to the relief prayed and granted the mandamus. The auditor complains of that judgment, hence this appeal.

Neither the demurrer nor answer makes any question as to the number of analyses made by the Agricultural Experiment Station, as to the correctness of the analyses or the competency of the persons by whom they were made. The paramount question to be determined is the one first presented by the demurrer and answer, viz: Is the act, under which the amount in suit is claimed from the State, or so much thereof as seems to authorize the payment of the claim, constitutional? The act was passed by the General Assembly in 1908 (see Acts 1908, page

10), and is contained in Chapter 53a, section 1905a, Kentucky Statutes (Carroll's Edition, 1915). It is entitled: "AN ACT for preventing the manufacture and sale of adulterated or misbranded foods, drugs, medicines and liquors, and providing penalties for violations thereof." The one section of the act, 1905a, contains fourteen subsections.

Subsection 8 makes it the duty of the director of the Kentucky Agricultural Experiment Station, or, under his direction, the head of the division of food inspection of the station, to make or cause to be made examinations of samples of food and drugs manufactured or on sale in this State, at such time and place and to such extent as he may determine.

Subsection 9 requires him to make report as to adulterated or misbranded foods or drugs to certain officers named therein, for the prosecution of the person or persons guilty thereof. Subsection 10 requires that he make an annual report to the governor upon adulterated food or drug products, and for the submission of such annual reports to the General Assembly at its regular sessions; and, in addition, for the issue from time to time of bulletins giving the results of such inspections and analyses as are made by him.

Subsection 11, which is the one here particularly involved, provides:

"Said Experiment Station shall receive seven dollars and fifty cents ($7.50) for the analysis or examination of any sample of food or drug taken or submitted in accordance with this act, and expenses for procuring samples of food and drugs and in making inspections into the condition of and wholesomeness and purity of the food produced, manufactured or sold in food factories, grocery stores, bakeries, slaughtering houses, dairies, milk depots or creameries, and all other places where foods are produced, prepared, stored, kept or offered for sale; for studying the problems connected with the production, preparation and sale of foods; for expert witnesses attending grand juries and courts; clerk hire and all other expenses necessary for carrying out the provisions of this act. *Provided,* The total expense from all sources shall not exceed in any one year thirty thousand dollars ($30,000.00).

"The Board of Control of said Experiment Station shall furnish to the Auditor of Public Accounts an item-

ized statement of the expenditures of money under this act. The expenditures reported to the Auditor shall be paid by the Commonwealth to the treasurer of the Experiment Station upon the written request of the Board of Control of the said Experiment Station, and the Auditor for the payment of the same is directed to draw his warrant upon the treasurer as in all other claims against the Commonwealth."

It is insisted for appellant that subsection 11 of the act violates section 51 of the Constitution of the State, which provides:

"No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title. * * * "

In the numerous decisions of this court interpreting section 51 Constitution, and applying its provisions, the following general rules appear to have been announced: First, the general manner in which the subject of an act is to be accomplished need not be expressed in the title. (Commonwealth v. Henderson, 11 Bush, 75; Commonwealth v. Bailey, 81 Ky., 395.) Second, stating the subject matter of the act, with unnecessary detail in the title, does not render the act unconstitutional. (Allen v. Hall, 14 Bush, 85.) Third, if all the provisions of an act relating to the same subject are naturally connected, and are not foreign to the subject expressed in the title, it is sufficient. (Burnsides v. Lincoln County Court, 86 Ky., 423; Johnson v. City, 121 Ky., 594; Diamond v. Commonwealth, 124 Ky., 418; McGloven v. Womack, 129 Ky., 274; Mark v. Bloom, 141 Ky., 474; Commonwealth v. Starr, 160 Ky., 260.) Fourth, the title cannot be used to extend or restrain the provisions in the body of the act. It must be fairly expressive of the context in the body of the act, and is to be read in connection with it in determining the meaning of the act. (Commonwealth v. Cain, 14 Bush, 525; Commonwealth v. Barney, 115 Ky., 475; Joyce v. Woods, 78 Ky., 386; Weimer v. Commissioner of Sinking Fund, 124 Ky., 377; Thompson v. Commonwealth, 159 Ky., 8.)

The meaning and object of section 51, Constitution, is thus well stated in Thompson v. Commonwealth, 159 Ky., 8:

"The purpose of the constitutional provision was to enable persons reading the title of an act to get a general idea of what the act treated of or contained, and it has

come to be a recognized legislative practice for members and others interested in legislation to read the title of acts and gather therefrom in a general way at least the subject-matter of the act, and under the authority of this constitutional provision members of the legislature, as well as the public interested in legislation, have the right to rely on the title as indicating the subject-matter of the act and to assume that the act contains no legislation that is not embraced in a general way by the subject expressed in the title.''

It is not to be overlooked that section 46, Constitution, declares that ''Any act or resolution for the appropriation of money or the creation of debt shall, on its final passage, receive the votes of a majority of all the members elected to each house.'' And section 230 provides:

''No money shall be drawn from the State Treasury, except in pursuance of appropriations made by law; and a regular statement and account of the receipts and expenditures of all public money shall be published annually.''

Manifestly, the $30,000.00 mentioned in sub-section 11 of the act under consideration is an appropriation in the meaning of sections 46 and 230, Constitution, *supra*. The $7.50 allowed by the section as compensation for each analysis that may be made is only a means or scale by which it is to be ascertained when the limit of the annual appropriation of $30,000.00 is reached. Therefore, the provision as to compensation for analyses does not constitute a system of fees, but merely establishes a scale by which the $30,000.00 is graded. The compensation for analyses and other expenses, for the payment of which the act provides, cannot, in any one year, exceed the $30,000.00 appropriation for such year. It is patent from the evidence appearing in the record that the authorities in charge of the Experiment Station have always treated the $30,000.00 as an appropriation, and, further, that they have, ever since the act in question became effective, each year drawn the entire $30,000.00 from the State Treasury.

We now come to the consideration of the main question: Does the act conform to the requirements of section 51, Constitution? Comparison of the contents of the body of the act with its title will demonstrate that, insofar as the provisions of sub-section 11 are concerned, it does not do so. In other words, all of the provisions of

the act, except those contained in sub-section 11, are embraced and covered by the title, because they each and all relate to and are naturally and directly connected with the subject expressed in the title. That is, they define what shall constitute an adulteration or misbranding of foods and chemicals, provide the means of detecting and preventing same, designate the offenses that may be committed under the act, and prescribe the penalties therefor. Sub-section 11, however, attempts to bring into the act and make a part thereof, various provisions which are foreign to the subject expressed in the title. These provisions relate to the making of compensation to the Experiment Station for analyses or examinations of samples of food or drugs, paying the expenses attending the procuring of such samples, the cost of clerk hire, attending grand juries and trials in prosecutions of offenders against the law; and finally, providing an annual appropriation of $30,000.00 for defraying all such items of cost and expense.

The phraseology of the title: ''An Act for preventing the manufacture and sale of adulterated and misbranded foods, drugs, medicines and liquors, and providing penalties for violations thereof,'' does not even suggest to the average mind that the body of the act provides for the expenditure of the money of the Commonwealth, required by the eleventh sub-section; or an intimation that such sub-section provides for an annual appropriation of $30,000.00. Being utterly silent as to the expenditures required and the appropriation made by this sub-section, the title of the act, when introduced and put upon its passage in the legislature, could have conveyed to the mind of the average legislator no other meaning or information than that its only object was to make it an offense for any person to manufacture or sell adulterated or misbranded foods, drugs, medicines or liquors, and prescribes the penalties therefor. The ostensible object of the act being the protection of the public, made it so attractive to the members of the General Assembly and the necessity for its passage so apparent, that the mere reading of its title was well calculated to induce them to give it their support, without taking time to examine the body of the act and thereby obtain an understanding of its numerous provisions; whereas, if the title of the act had given any intimation that it contained an appropriation of $30,000.00 to be paid by the

State annually for. an indefinite number of years, it would, at least, have been understandingly considered and voted on. But the title gave no intimation of the appropriation that lay concealed as far down in the body of the act as its eleventh sub-section, to reach which ten other sub-sections, dealing with totally different matters, must first be read. Being thus preceded and hedged about by other provisions that appear to be germane to the subject expressed in the title, the appropriation contained in sub-section 11, which is not even remotely referred to in the title or necessarily connected with the subject therein expressed, was so disguised as to render its presence in the body of the act well nigh undiscoverable without a reading of the entire act.

The situation here presented is one that section 51 of the Constitution was intended to prevent, and which could have been prevented by the addition to the title of the act of another sentence, indicating that the act contains an appropriation of $30,000.00 per annum to meet the expenses of carrying out its provisions. There can be no doubt that the act in question relates to two subjects, viz: (1) The preventing of the manufacture and sale of adulterated or misbranded foods, drugs, medicines and liquors, and providing penalties for so doing; (2) An appropriation from the revenues of the State of $30,000.00 per annum. It is equally free from doubt that only the first of these subjects is expressed in the title of the act, as the Constitution provides. It may also be remarked that the first subject to which the act relates appertains to the criminal or penal laws, and the second alone to an appropriation of the State's money. As section 46, Constitution, provides that any act or resolution for the appropriation of money or the creation of debt, shall not become a law unless on its final passage it has received the votes of a majority of all the members elected to each house, it would not be wide of the mark to say that adherence to the requirements of section 51, Constitution, is of the utmost importance, in order that the members of the General Assembly may be fully informed in voting upon an act carrying an appropriation, and the taxpayers of the State advised, after its passage, as to the meaning of its provisions.

In Ragland, etc., v. Anderson, 125 Ky., 141, we said:

"It is for the courts to measure the acts of the General Assembly by the standard of the Constitution, and

if they are clearly and unequivocally in contravention of its terms, it becomes the duty of the judiciary to so declare. Of course, if the question as to whether or not the legislation is inimical to the Constitution be doubtful, it will always be decided in favor of the constitutionality of the law. But where the matter is plain that the Constitution has been violated, then the courts cannot escape the duty of so declaring whenever the matter is brought to their attention. And no matter how distasteful it may be for the judiciary to review the acts of a co-ordinate branch of the government, their duty under their oath of office is imperative." Varney v. Justice, 86 Ky., 596; Marbury v. Madison, 1 Cranch (U. S.), 49.

In McCreary, Governor v. Spear, 156 Ky., 783, we also said:

"It is true our Constitution contains no provision to the effect that all its provisions are mandatory; but we deem this immaterial for the reason that this court had held before the adoption of the present Constitution that all the provisions of a constitution are mandatory; and the Constitution must be presumed to have been adopted with this understanding of its meaning. Since the adoption of the Constitution the court has steadily maintained the same rule." Prison Commissioners v. Spencer, 159 Ky., 255.

In Burton v. M. & B. Turnpike Co., 162 Ky., 787, we further said:

"In Hyser v. Commonwealth, 116 Ky., 410, it was said: 'This court has repeatedly announced, in effect, that no provision of a statute directly or indirectly relating to the subject expressed in the title, having a natural connection therewith, and not foreign to the same, should be deemed within the inhibition of section 51 of the Constitution.' This broad, liberal rule was approved in the early leading case of Phillips v. Cincinnati & Covington Bridge Co., 2 Met., 219; and again in Collins v. Henderson, 11 Bush, 74; Hoke v. Commonwealth, 79 Ky., 567; Commonwealth v. Bailey, 81 Ky., 395; Burnside v. Lincoln County Court, 86 Ky., 423; Conley v. Commonwealth, 98 Ky., 125; and Eastern Kentucky Coal Lands Corporation v. Commonwealth, 127 Ky., 667. In recognizing this rule, however, this court, in Thompson v. Commonwealth, 159 Ky., 12, declared:

" 'But in no instance has this rule been extended so as to legalize legislation that departs so radically from the

title of the act as do the sections here under consideration.   Here the title of the act limited the scope of the legislation to the appropriation of money for the benefit of the houses of reform, and this limitation in the title reasonably and naturally conveyed the meaning that the body of the act was confined to the appropriation of money and no other subject.' ''

It is our conclusion that so much of the act under consideration as is included in sub-section 11 of section 1905a is violative of section 51 of the Constitution and, therefore, void.   This conclusion does not, however, render invalid the remaining sub-sections of the act, which seem to be germane to the subject expressed in the title, as it is manifest that sub-section 11 can be eliminated from the act without, to any extent, affecting the subject matter of the germane parts.   The rule in such case being as stated in Weimer v. Commissioner of Sinking Fund, 124 Ky., 337:

''When a subject foreign to the title is introduced into the body of an act, if it is so separate and distinct from the remainder of the subject matter of the legislation that it may be omitted without affecting the otherwise valid portions, then the unconstitutional part will be omitted and the remainder allowed to stand.''   Jones v. Thompson, 12 Bush, 394; Fuqua v. Mullens, 13 Bush, 667; Thompson v. Commonwealth, 159 Ky., 8; Burton v. M. & B. Turnpike Co., 162 Ky., 787.

The conclusion we have reached renders unnecessary the decision of the other question urged in the brief of appellant's counsel; and as the salutory object of the act cannot fully be carried out without the appropriation, made invalid by the elimination of sub-section 11 thereof, it is assumed that the General Assembly will at its approaching session so amend the act as to make the needed appropriation, and, at the same time, allow its application to the erection of the cold storage plant and abattoir desired by appellee.

For the reasons indicated the judgment is reversed and cause remanded, with directions to the lower court to sustain the demurrer to the petition and dismiss the action.   Whole court sitting.