## Commonwealth v. Barnett, et al.

(Decided December 8, 1922).

### Appeal from Boyd Circuit Court.

1. Statutes—Repeal by Implication.—Repeals by implications are not favored and such repeals whether of a statute or of the prevailing common law on the subject will not be adjudged, unless it clearly appears from the language of the repealing statute to have been so intended by the legislature, and this rule applies to the criminal law as well as to the civil.

2. Statutes—Repugnancy—Repeal.—If there is no repugnancy between the common law or a prior statute and a later one dealing with only some parts of the prior law the later statute will not repeal the prior law by implication, unless it is plainly manifest that the legislature intended to cover and legislate with reference to the whole subject. If the alleged repealing statute may be referable to some one or more of a class of subjects covered by the prior law it will be construed to repeal the prior law only as to such referable subjects leaving the remainder intact.

3. Conspiracy—Criminal Responsibility.—Conspiracies are crimes punishable under the ancient English common law, but, without any overt act by the conspirators or any of them to carry into the execution the object of the conspiracy, the conspiracy alone was but a misdemeanor at common law, and if the object of the conspiracy was executed it would become merged in the executed crime if the latter was one of greater degree than the conspiracy.

4. Conspiracy—Construction of Statute—Repeal.—Sections 1241a-1 to 1241a-7, both inclusive, were enacted at the 1902 session of the Legislature which is chapter 25, page 55, of the published acts of that session, and that act was an amendment and re-enactment of a prior one enacted at a special session in 1897 and which is found on page 29 of the published acts of that session; and considering the title to the two acts, the prevailing conditions at the time, and the mischief sought to be prevented, it is clear that it was not the intention of the legislature in enacting the statute to repeal all of the common law relating to criminal conspiracies and other crimes committed in carrying them out. But, on the contrary, it was the intention of the legislature to increase the punishment for certain named conspiracies and to make them felonies instead of misdemeanors as at the common law.

5. Conspiracy—Overruled Cases.—The punishment prescribed in section 1241a-3 was intended to apply to depredations therein named

as a result of the confederating, conspiring and going forth denounced in section 1241a-2 and has no reference to section 1241a-1, since by the very terms of section 1241a-3 it is confined to the matters set forth "in the preceding section of this act," and in so far as the opinion in the case of Jenkins v. Commonwealth, 167 Ky. 544, is in seeming conflict therewith, it is overruled.

6.  Immunity—Constitutional Guaranty.—Statutes extending immunity from prosecution to a witness in consideration of his testifying in another prosecution must be as comprehensive as the constitutional guaranty against compulsory testimony against himself, but no such immunity will be extended except in cases to which the statute granting it makes it applicable.

7.  Witnesses—Conspiracy—Immunity.—A witness who testifies for the Commonwealth in a prosecution under an indictment charging a conspiracy to break up an election and to murder the deceased, all of which was done pursuant to the conspiracy, is not entitled to the immunity extended by section 1241a-7, since the prosecution in which he testified was not one under the act of which the immunity section is a part.

CHAS. I. DAWSON, Attorney General, THOS. B. McGREGOR, Assistant Attorney General, WAUGH & HOWERTON, RYLAND C. MUSICK, and JOHN C. COLDIRON for appellant.

A. F. BYRD, A. H. PATTON and H. R DYSARD for appellees,

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

At the regular election held in Clayhole precinct of Breathitt county on November 8, 1921, Asberry Combs, Cleveland Combs, Ethan Allen and George McIntosh were killed, while seventeen others were wounded. The grand jury indicted Will Barnett, Willie Davis, Will Campbell, Alfred Barnett, Amby Barnett, Marion Barnett, Ed Davis, Ed Combs and Chester Davis for the murder of Asberry Combs. At the same time Leslie Combs, French Combs, Shade Combs and George Allen, Jr., were indicted for the murder of George McIntosh. On motion of the Commonwealth, a change of venue was granted and the prosecutions transferred to the Boyd circuit court, where the indictments were quashed and the causes referred to the grand jury of that county. Shortly thereafter the grand jury of Boyd county returned an indictment against Leslie Combs, French Combs, Shade Combs and George Allen, Jr., charging them as principals and aiders and abettors in the murder of George McIntosh, and also containing a count charging them with having entered into a conspiracy to break up the election, and having killed McIntosh

while carrying out that conspiracy. On the trial of that indictment Will Barnett and the others who were jointly indicted with him under a separate charge for the murder of Asberry Combs testified as witnesses for the Commonwealth and detailed their conduct and speeches, not only on the day of the homicides, but for several days prior thereto. Thereafter the grand jury returned another indictment against Will Barnett and others, charging them with having banded themselves together and having entered into a conspiracy to break up the election and with having murdered Asberry Combs while carrying out that conspiracy. Upon the calling of that case for trial, Barnett and his codefendants filed a plea in bar claiming immunity from prosecution because of the evidence which they gave in the trial of French Combs, et al. Thereupon the court entered this order:

"It is considered and adjudged by the court that in the trial of the defendants herein for the murder of Asberry Combs that the testimony given by them, or any of them, as witnesses for the Commonwealth in the trial of this case in this court, on a former day of the term, wherein the Commonwealth of Kentucky was the complainant and French Combs, Shade Combs, Leslie Combs and George Allen, Jr., were defendants for the murder of George McIntosh, so far as they testified to his or their acts, conduct or movements prior to the shooting of George McIntosh and Asberry Combs, or the beginning of the difficulty in which they were shot and killed on the morning of November 8th, 1921, may not be used against them in the trial of this case against these witnesses, and so far as any such testimony, as to their acts, conduct or movements, prior to the commencement of the difficulty in question conduces or tends to show an agreement or conspiracy on the part of said witnesses to intimidate or injure any officer of the election at and of the Clayhole voting precinct No. 22 of Breathitt county, Kentucky, at the regular November election held in said county on November 8th, 1921; or to prevent any of said officers from performing his duty as such officer; or from preventing any legal voter of said precinct from casting his or her vote at said election as he or she desired to cast same, the facts so testified to by the said witnesses at the former trial may not in this case be gone into or proven by the Commonwealth for the purpose of showing the defendants

in this case made an agreement, combination or conspiracy to do the same things the defendants, French Combs and others, in case No. 254, were charged with conspiracy to do, but the court also adjudges that such testimony so given by the defendants herein in case No. 254 is not a bar to their trial and conviction for the murder of Asberry Combs, nor for any conspiracy to do so other than the one charged under section 1241a-1 of the Kentucky Statutes, and only to the extent the testimony of the defendants given in the trial of case No. 254 shows, or conduces to show, a violation by them of section 1241a-1 and same is included or embraced in the indictment against them for which they are to be tried is such testimony held and adjudged a bar to their conviction in this case or to be excluded from the consideration of the jury in their trial for the murder of Asberry Combs.

"The Commonwealth is permitted to prove the defendants or any one or more of them shot and killed Asberry Combs and that the others, or any of them, aided, advised, encouraged, etc., the one, or more who did the shooting, and all their acts, conduct and movements at the time of the difficulty just previous thereto, and while it lasted, and if able to show or prove a conspiracy other than the one indicated and set out under section 1241a-1 and proven by testimony outside of the acts, conduct and movements of the defendants, testified to by them in case No. 254 the court will allow it to do so."

From the foregoing order the Commonwealth appeals.

Section 1241a-1, Kentucky Statutes, says: "If any two or more persons shall confederate or band themselves together for the purpose of intimidating, alarming, disturbing or injuring any person or persons, or to rescue any person or persons charged with a public offense from any officer or other person having the lawful custody of any such person or persons with the view of inflicting any kind of punishment on them, or with the view of preventing their lawful prosecution for any such offense or to do any felonious act, they, or either of them, shall be deemed guilty of a felony, and upon conviction shall be confined in the penitentiary not less than one nor more than five years."

Section 1241a-2 makes it unlawful for two or more persons to band themselves together "and go forth" for the purpose of injuring property, whether it be in-

jured or not, and provides a penalty therefor. Section 1241a-3 says: "If any injury shall result to the person or property of any person or persons, by reason of any unlawful acts denounced in the *preceding section* of this act," then the person or persons engaged or participating or any one or more of them aiding or abetting shall be guilty of a felony and upon their conviction shall be confined in the penitentiary not less than one nor more than fifteen years, "unless death should result in which case the penalty for such offense shall be as now prescribed by law." Other provisions in that section relate to matters foreign to any involved on this appeal. Section 1241a-6 provides a punishment for sending threatening letters, while section 1241a-7 says: "In any prosecution under this act it shall be no exemption for a witness that his testimony may incriminate himself; but no such testimony given by the witness shall be used against him in any prosecution except for perjury, and he shall be discharged from all liability for any violation of this act so necessarily disclosed in his testimony." It will be observed that the seventh section (1241a-7) grants immunity to a witness for his violations of the act, only where he testifies *in* a prosecution *"under this act,"* and the only question we deem it necessary to decide is whether appellees were witnesses in a prosecution under the act, leaving out of the consideration the further one, whether they were indicted for an offense *under* it.

The conspiracy count in the indictment against French Combs and others, on whose trial appellees testified, is as follows: "The grand jury of Boyd county in the name and by the authority of the Commonwealth of Kentucky accuse French Combs, Shade Combs, Leslie Combs, and George Allen, Jr., of the crime of wilful murder committed in manner and form as follows, to-wit: The said French Combs, Shade Combs, Leslie Combs, and George Allen, Jr., on and before the 19th day of December, 1921, in the county of Breathitt and state of Kentucky, and before the finding of this indictment, did unlawfully, wilfully, feloniously and with their malice aforethought form and enter into a conspiracy with each other and with other persons unknown to the grand jury, the purpose of which was to prevent any election being held in the Clay Hole precinct in Breathitt county, Kentucky, on the regular election day in November, 1921, at which time and place county officers were to be elected and voted for in said election in said precinct and also at the

time and place a state senator was to be elected for the senatorial district in which said county and precinct was located and the further purpose of said conspiracy was to intimidate the officers of the election in the said precinct and prevent them from holding an election and also to intimidate the legal voters in said precinct and to prevent them from casting their vote at said election at said time and the further purpose of said conspiracy was to kill and murder one George McIntosh and any other person or persons who might attempt to hold an election in said precinct at said time and pursuant to said conspiracy and in furtherance thereof and while the same existed the said defendants, French Combs, Shade Combs, Leslie Combs and George Allen, Jr., or some other person to the grand jury unknown who as a member of said conspiracy and while engaged in an effort and in attempting to carry out and consummate each and every purpose of said conspiracy as above stated did unlawfully, wilfully, feloniously and with their malice aforethought kill and murder the said George McIntosh with guns and pistols loaded with powder and leaden ball and other hard and explosive substances, from which shooting and wounding the said George McIntosh did then and there die contrary to the form of the statutes in such cases made and provided and against the peace and dignity of the Commonwealth of Kentucky.''

Criminal conspiracies were offenses ''known to the ancient English common law antedating all legislative enactments.'' 12 Corpus Juris 542; Bishop's New Criminal Law, vol. 2, section 176. And it is pointed out in both of the references that the offense was not created by the statute of 33 Edward 1, but that it was ''only declaratory of the common law, as far as it goes, operating to remove doubts and difficulties which may have existed with reference to the conspiracies which it enumerates, by giving them a particular and definite description, or as superadding them to other classes of conspiracies already known to the law, leaving the common law unaffected beyond the express provisions of the statute.'' That statute pointed out and named certain acts which it denounced as unlawful and made it an offense for two or more persons to confederate and conspire to bring about the accomplishment of any of them. It was what Mr. Bishop in his work on Statutory Crimes, sections 153-154, denominates as an affirmative statute, and, as stated in subsection 2 of section 174, vol. 2, of his

New Criminal Law, it "abrogates nothing in the prior common law, but leaves indictable whatever conspiracy was so before." Section 154 of the author's work on Statutory Crimes in part says: "An affirmative statute repeals by implication so much of the prior law as, after the harmonizing work of interpretation is fully done, remains repugnant to it; for it is the last expression of the will of the law-making power. If two acts in seeming conflict can be reconciled by any fair construction, so that both may stand, they must be; and then no repeal will be held to take place. And it is the same with a provision of the common law and a statute." He then states the universally applicable rule that repeals (either of a prior statute or of the common law) are not favored and are not to be presumed; and in section 155 of the same work it is said, in substance, that a statute dealing with a common law offense will not be construed as repealing by implication such common law offenses, "beyond their words or the clear repugnance of their provisions; that is, the new (statutory offense) displaces the old only as directly and irreconcilably opposed in terms." And it is then added: "For when the legislative power professes to add to the law, as it does in the enactment of an affirmative statute, we cannot assume for it an intention also to subtract from it, while there is any admissible rule of interpretation which, applied to the old, to the new, or to both, will enable all to stand."

The same rules for the interpretation of statutes dealing with acts which were crimes at the common law are also stated in 12 Corpus Juris, 186-187, and vol. 16 of the same work, page 67. In the first reference the text says: "The common law is impliedly repealed by a statute which is inconsistent therewith, or which undertakes to revise and cover the whole subject matter. The common law is not repealed, however, if there is no repugancy between it and the statute, and it does not appear that the legislature intended to cover the whole subject. It is a maxim of the common law that a statute made in the affirmative, without any negatvie, express or implied, does not take away the common law," In the latter reference to the same work dealing with the title "Criminal Law" the text says: "A statute does not impliedly repeal the common law where they are not inconsistent and both can stand. One act which in law amounts to an offense will not cease to be such because another act is merely declared by statute, without negative words or

clearly implied negative intention, to amount to the same." These general rules for determining the scope and effect of statutory created crimes, or for the regulation of offenses which were already punishable at the common law, are extensively discussed, adopted and applied by this court in its opinion in the case of Commonwealth v. Kentucky Distilleries & Warehouse Co., 154 Ky. 787, no part of which will we repeat here, nor will we insert any of the numerous cases and authorities referred to in that opinion.

A conspiracy at the common law consisted in an agreement, confederation or combination "between two or more persons to do a criminal or an unlawful act by criminal or unlawful means." or to do a lawful act by unlawful means (12 Corpus Juris, 540; Bishop's New Criminal Law, vol. 2, sec. 171), and a conspiracy merely to commit a crime is an offense within itself without any accompanying or succeeding overt act in an effort to execute the purpose for which the conspiracy was formed (12 Corpus Juris 542 and 549), the unlawful combination alone forming the gravamen of the offense, and it was only a misdemeanor at common law. In 12 Corpus Juris 580-581, the text on the latter page says: "At common law a conspiracy, whether it be to commit a misdemeanor or a felony, is merely a misdemeanor. Where a certain kind of conspiracy is defined and made punishable by statute but not declared a felony, it also is merely a misdemeanor." Numerous cases from various courts are cited in the notes to the text; and it makes no difference whether the conspiracy is formed to commit a statutory crime or a common law crime; but whether it be to commit the one or the other the offense consisting of the conspiracy alone is merged in the commission of the object of the conspiracy if the latter be of a higher grade than that of misdemeanor. Commonwealth v. Blackburn, 1 Duvall 4; Commonwealth v. Harper, 195 Ky. 843, and 12 Corpus Juris, 579-580.

With these universally recognized and applied principles relating to statutes dealing with described crimes belonging to a class of common law ones, and relating to the offense of unlawful conspiracies, we will now proceed to examine the statute under which defendants and appellees claim the immunity which the trial court granted them in the judgment appealed from for the purpose of determining whether the prosecution in which they testified was one *"under this act"* (sections

1241a-1 to 1241a-7, inclusive), for, unless so, the immunity could not be claimed, which proposition is so axiomatic as to seem to require no supporting authorities, though in People v. Argo, 237 Ill. 173, 86 N. E. R. 679; Temple v. Commonwealth, 75 Va. 892, and 40 Cyc. 2545, it is so stated.

Before attempting an analysis of the statute in order to determine its intended scope and application, it might be well to remember that it is competent in order to ascertain the intention of the legislature in the enactment of a statute to consider the prevailing conditions at the time of its enactment, and the mischief intended by the legislature to be remedied by it, and one of the things to which reference may be made in arriving at such intention is the title of the act. 36 Cyc 1133; 25 R. C. L. 1031; notes to People, etc . v. McElroy, 2 L. R. A. 610; U. S. v. Fisher, 2 Cranch 358; U. S. v. Palmer, 3 Wheat 610; Bosworth v. State University, 166 Ky. 436; L. R. A. 1917B 808, and many cases cited in note 13 to the text in R. C. L. In Pennsylvania Railroad Co. v. Riblet, 66 Pa. 164, and in Halderman's Appeal, 104 Pa. 251, it was said, in substance, that under a constitutional prohibition against more than one subject in any statute, and a requirement of its clear expression in the title, the latter necessarily becomes a part of the statute "and aids, if need be, as a very important guide in its construction."

The statute under consideration was first enacted at the 1897 special session of the legislature. It is chapter 20, page 29, of the published acts of that session, and its title reads: "An act to prevent lynching and injury to and destruction of real and personal property in this Commonwealth at the hands of mobs or other riotous assemblages of persons, and to prevent the posting and circulation of threatening letters, and to prescribe penalties for the enforcement of its provisions." That act was amended and the sections as now appearing in the 1922 edition of Carroll's Statutes were enacted at the regular 1902 session of the legislature, which is chapter 25, page 55, of the published acts of that session, and its title says: "An act to amend and re-enact an act entitled 'An act to prevent lynching and injury to and destruction of real and personal property in this Commonwealth at the hands of mobs or other riotous assemblages of persons, and to prevent the posting and circulation of threatening letters, and to prescribe penalties

for the enforcement of its provisions,' same being chapter twenty of the acts of eighteen hundred and ninety-seven, and which was approved by the Governor May 20, 1897.''

It is not necessary for the purposes of this opinion to point out the changes which the 1902 act made in the 1897 one, since they can be ascertained by reference to the two acts, though it might be stated that sections 5, 6 and 7 of the 1897 act were stricken out by the 1902 act, and the first one of them conferred power on the sheriff or any constable of the county, after being ordered to do so by any county or circuit judge before whom certain affidavits were filed, to summon a posse for the purpose of guarding toll gates or turnpikes the destruction or injury to which was the object of the conspirators. But we are not concerned with what was contained in the stricken sections, nor with other changes made in the 1897 act. From the title of the act as first passed in 1897 it is to be observed that the purpose in hand was to prevent lynching and injury to and destruction of real and personal property ''at the hands of mobs or other riotous assemblages of persons'' and in furtherance thereof to prevent the posting or circulation of threatening letters by such conspirators. We learn therefrom that it was by no means the intention of the legislature to *cover the entire field of common law conspiracies* by the enactment of the statute, but rather its intention was to enlarge the degree of certain conspiracies therein named from a misdemeanor at common law to a felony and to fix a felonious punishment for any overt acts in carrying out certain of the named conspiracies in the act. The mischief sought to be remedied at the time the statute was enacted was the formation of mobs in certain portions of the Commonwealth for the purpose of destroying tollgates on turnpikes and which were known at the time as ''tollgate raiders.'' In 1902 the tollgate question, which grew up because of privately owned turnpikes, was practically eliminated by the various counties through which they ran acquiring them, but at the latter date another class of offenders appeared in the Commonwealth known as ''night riders,'' and the statute was amended so as to eliminate its unnecessary specific sections relating to ''tollgate raiders'' and it was reformed so as to apply to the actions and conduct of the newly created menace by ''night riders,'' or others of the same genus. We are,

therefore, justified in concluding that the sole purpose of the statute was directed at suppressing and punishing the acts and doings of all unlawful agencies and combinations properly classified as "mobs," and that it was never intended to cover the whole law of common law conspiracies. Having so concluded, we will now proceed to an analytical examination of the statute to see whether the prosecution in which appellees and defendants gave their testimony was one "under this act;" and in so doing we will refer to the sections involved as 1, 2, 3 and 7, instead of the numbering 1241a-1, etc., as contained in the 1922 published statutes.

Section 1 of the act makes it an offense for two or more persons to confederate or band themselves together for the purpose of doing certain enumerated things "or to do any felonious act," and punishes them for such confederating and banding together by confinement in the penitentiary not less than one nor more than five years. It is not altogether clear but that the *ejusdem generis* doctrine should apply to the expression in the statute, "or to do any felonious act," since, as we have seen, the purpose of the statute was to punish conspiracies for the formation of mobs organized and entered into for the purpose of correcting or regulating some imaginary evil and that the quoted expression was intended to apply to kindred formations of kindred bands to those expressly enumerated, and to include all other self-executioners of mob law whether they be known as "tollgate raiders," "night riders," "possum hunters," "ku klux" or other similar marauding bands; but under our view of the proper construction of the act it is not necessary to, and we do not determine that question. The section (No. 1) as enacted does not require any *going forth* by the conspirators, nor the doing of any overt act in order to complete the crime denounced therein. It is completed when the unlawful agreement constituting the conspiracy is assented to. It may be committed in a room, on the streets, or at any other place without a single movement on the part of any of the conspirators. That crime was one at common law but was only a misdemeanor and all that the statute did was to punish the particular conspiracies included in it with confinement in the penitentiary instead of with a misdemeanor punishment. If there should be any *going forth* or other overt act as a consequence of the conspiracy denounced by section 1 the crime or crimes com-

mitted by reason thereof would be punishable according to the law prescribed for such crimes, and the conspiracy would be merged in them if they were of a higher degree than the conspiracy, as we have heretofore shown.

Section 2 of the act requires for its perpetration more than a mere forming of a conspiracy, since to constitute it the conspirators must "go forth," in addition to conspiring, "for the purpose of molesting, injuring or destroying any property, real or personal, of another person, persons or corporation," and they are guilty and the crime is complete whether or not the property be injured, molested or damaged by their "going forth." The crime denounced in that section is aimed at the protection of property of another and punishes those who conspire to go forth to destroy it. If any property is destroyed by the conspirators while going forth for the purpose, or any person is injured, but not killed, as an outgrowth of such *going forth,* they are guilty of the offense denounced in section 3 of the act and punished by confinement in the penitentiary for not less than one nor more than fifteen years. But if a person is killed as an outgrowth of the going forth to destroy the property for which the conspiracy was formed all the conspirators incur the penalty for such offense "as now prescribed by law," *i. e.,* the killing would be manslaughter, or murder, accordingly as it would be without the statute. The latter section, (3), of the act expressly confines its application to any result or injury therein named "by reason of any unlawful acts denounced in the *preceding section* of this act" which preceding section, as we have seen, is the one punishing the named conspiracies therein followed by a going forth pursuant thereto "for the purpose of molesting, injuring or destroying any property" of another, and we are convinced was intended to be confined to injuries resulting from the going forth for the purpose denounced in such preceding section, (No. 2). We not only have the literal language employed by the legislature confining the application of section 3 to the acts denounced in section 2, but we have examined the enrolled bills as enacted by the 1897 session and also the 1902 session of the legislature and each of them uses the singular noun "section" at the beginning of section 3, wherein it is said: "If any injury shall result to the person or property of another person or persons, by reason of any unlawful acts denounced in the next preceding *section* of this act." We cannot escape the

conclusion that if it was intended by the legislature to make applicable the provisions in section 3 to all the preceding sections it would not have used the singular noun at both of the sessions at which it enacted the three sections as they now appear printed in the statutes. Furthermore, there exists to our minds a plain and cogent reason why section 3 referred and was made to apply to only the injuries resulting from the offense denounced in section 2 and not to those denounced in section 1 of the act. The latter offenses, as we have seen, are complete without any succeeding act or conduct on the part of the conspirators from which or out of which any injury either to person or property could be inflicted, while it was more than possible that such injuries would be inflicted as a result of the ''going forth'' necessary to constitute the crime denounced in section 2 of the act. Persons can not inflict the injuries covered by section 3 by remaining passive as is only required to constitute the crime under section 1; but, if they become active, as is required for the commission of the crime under section 2, such injuries would most probably result.

We are aware that there is a dictum to the contrary in the opinion in the case of Jenkins v. Commonwealth, 167 Ky. 544, but a decision of the question was not necessary to a determination of the question presented in that prosecution. The indictment therein not only charged defendant with banding together with others but also with *going forth* and injuring the persons who were the object of the conspiracy, and was no doubt drawn under section 1223 in the 1922 edition of the statutes, which was enacted at the long session of the legislature of 1891-2-3, than under the statute now under consideration enacted in 1902, but which section, it was held by this court in the case of Commonwealth v. Hightower, 149 Ky. 563, was repealed by the latter act. But, whether so or not the appellant in that case complained of an instruction authorizing the jury to punish him with confinement in the penitentiary for not less than one year nor more than fifteen years as is provided by section 3 of the 1902 act; but his punishment was fixed at ''not less than four nor more than four years and one day,''which was not the maximum punishment under section 1 of the act under which he claimed he should be punished. Manifestly, the error, if it was one, in allowing the jury by the instruction to inflict the maximum

punishment of fifteen years, contained in section 3 of the statute, was not prejudicial to the appellant in that case, since he obtained less than the maximum punishment for the offense of which he claimed he was accused.

We are also aware that according to section 457 of the statutes, "A word importing the singular number only may extend and be applied to several persons and things, as well as to one person or thing," and *vice versa;* but the statutory rule of construction is not invoked unless necessary to carry into effect the plain and manifest intention of the legislature. Where the intention is plainly manifest without a resort to the rule it will not be invoked. As we have already seen there exists in the statute now under consideration a manifest reason why section 3 should refer to and apply only to the acts denounced in section 2 of the act and that the perpetrators of the crime denounced by section 1 may also be appropriately punished, *i. e.*. they will be sent to the penitentiary if found guilty for merely forming the conspiracy therein donounced without doing any other act, and if they go further and commit a distinct crime they may receive for it the punishment adapted to such crime. The dictum, as we construe it in the Jenkins case, should not, therefore, be followed, and in so far as it holds to the contrary of what has herein been said it is overruled.

The foregoing interpretation also accords with the rules hereinbefore stated with reference to implied repeals of either a statutory or common law offense, since it can not be concluded that the legislature by enacting the 1902 statute intended to supplant all of the common law with reference to conspiracies; but that left all of them intact, except those specifically dealt with, and perhaps others of a kindred nature.

Applying our construction of the 1902 act, it will at once be seen that the prosecution of Leslie Combs and others, in which appellees and defendants herein testified, was not one *"under this act"* but was one involving a conspiracy for the double purpose, as charged in the indictment, of breaking up and destroying the election at Clayhole precinct in Breathitt county, and for the purpose of murdering George McIntosh, which are cognizable at common law and are not affected in any way by the statute under which the immunity is claimed, there being no charge in the indictment of any banding together or going forth by Combs and others for the

purpose of destroying or injuring property of another, or that by reason of going forth for any such purpose McIntosh was killed.

Even if the indictment upon the trial of which defendants testified was for an offense denounced by the statute they are not extended immunity except for their own crimes committed under the act "necessarily disclosed" in their testimony, and we entertain grave doubts as to the witness being entitled to the immunity if the offense he committed against the statute was far removed in point of time from the one he testified and for the disclosing of which by his testimony there could be no reasonable necessity.

It is undoubtedly true, however, that if the prosecution in which defendants testified was one under the provisions of the act the immunity should be as broad as the constitutional guaranty against one giving evidence against himself. 40 Cyc. 2543-2545; Counselman v. Hitchcock, 142 U. S. 547; Brown v. Walker, 161 U. S. 591; Ex Parte Louis Cohen, 26 L. R. A. 423, and others referred to in those opinions. It would perhaps be true that the immunity should be given where the overt acts in carrying out the different and distinct conspiracies are so intermingled as to render it necessary for the witness to disclose his participation in *his* conspiracy, but that question we need not determine for the reasons hereinbefore stated.

It results, therefore, that the court erred in overruling the demurrer filed by the Commonwealth to the plea in abatement filed by defendants and appellees, and also erred in rendering the judgment appealed from.

Wherefore, the judgment is reversed with directions to set it aside and to sustain the demurrer to the plea in abatement and for proceedings consistent with this opinion.

Whole court sitting.