## Goodpaster, Director of Insurance, v. Kenton & Campbell Benev. Burial Ass'n et al.

June 9, 1939.

A. M. Caldwell, Judge.

Hubert Meredith, Attorney General, A. E. Funk and Jesse K. Lewis, Assistant Attorneys General, and Richard P. Dietzman for appellant.

Galvin & Tracy and Barbour & Bassmann for appellees.

OPINION OF THE COURT BY JUDGE STITES—Affirming.

This is an appeal from a judgment of the Campbell Circuit Court in favor of the appellee, Kenton and Campbell Benevolent Burial Association, against the

Commonwealth's Attorney for the Seventeenth Judicial District and the appellant, Sherman Goodpaster, Director of Insurance of the State of Kentucky. The Director of Insurance is the only appellant but he has joined the Commonwealth's Attorney as an appellee. There are a number of members of the association who are likewise made parties and are named as appellees. We shall in this opinion, however, refer to the Kenton and Campbell Benevolent Burial Association as the appellee, since it is the real party in interest. It operates a burial association in Kenton and Campbell Counties and has something over 40,000 members. It was organized by eleven undertakers in 1911, pursuant to Chapter 143 of the Acts of 1906 (Kentucky Statutes 1930, Section 199a-1 et seq.). At that time there were a number of similar associations operating in the same territory. The original act of 1906 has undergone several amendments most of which have apparently been inspired by the exigencies of competition in the business. In Newport Benevolent Burial Association v. Clay, 170 Ky. 633, 186 S. W. 658, it was determined that burial associations similar to appellee were subject to regulation (particularly as to rates) by the Insurance Commissioner and, following this decision, most of the other associations liquidated and appellee was left in substantial control of the field.

Appellee's method of doing business is to sell a "membership certificate" providing for the payment of weekly dues varying from five cents to thirty cents in accordance with the age of the member. In consideration of these payments the association agrees to provide "a respectable burial" for its members, through the services of a selected list of undertakers—now numbering nine.* On the back of each membership certificate there is printed a list of the nine "official association undertakers" under this provision, in heavy type: "No benefit from this certificate will be paid unless you call one of the official undertakers listed below."

Under Chapter 33 of the Acts of 1932 (Kentucky Statutes, Section 199a-11) it was made unlawful for any burial association to issue a certificate "which shall provide for the payment of any funeral benefit in merchandise or services, but all payments of benefits thereunder must be made in money." In the case of Kenton & Campbell Benevolent Burial Association v. Quinn, 244

* See note at end of opinion.

Ky. 260, 50 S. W. (2d) 554, 556, it was held that the certificate limiting the field of choice to nine undertakers and agreeing to pay (in cash) any one of the nine so selected by the representatives of the insured was not a violation of the statute. The Court said:

"In prohibiting burial associations from paying funeral benefits in merchandise and services and requiring the payments of benefits to be made in money, the Legislature intended to protect the members of such associations from fraud and imposition on the part of the insurer and to enable them to obtain the full consideration provided for in their respective contracts. The purpose of the member in the first instance in entering into the contract is to guarantee that he will receive a respectable burial. The proposed contract safeguards that purpose and prevents the proceeds of the policy from being diverted to another use. The member, or, after his death, those nearest in relationship to him, or having charge of his remains, may select one of the nine undertakers named in the certificate to furnish the specified merchandise and service. What effect a more limited field of choice would have as to the validity of the contract need not be determined, since we are of the opinion that the proposed contract affords the member, or, after his death, the one named therein as his representative, a field of choice sufficiently broad to render it unobjectionable under the act. The act provides that the payments made by burial associations shall be used as funeral or burial benefits, and the proposed contract guarantees to the insured that the proceeds of his policy will be used for the purpose intended by him, and is in accordance with the provisions of the act."

Following the decision in the Quinn case the Legislature amended the 1932 Act by Chapter 150 of the Acts of 1938 (Kentucky Statutes, 1938 Supplement, Section 199a-11) by adding this proviso:

"It shall be unlawful for any such policy, contract, bond, assurance or guarantee, or any such by-law, to provide that the payments of said benefits, or any part thereof, shall be made to any official undertaker, or to any designated undertaker or undertaking concern, or to any particular trades-

man, or business man, so as to deprive the personal representative or family of the deceased from, or in any way, to control them in, procuring and purchasing supplies and services incident to the burial of the deceased, in the open market, with the advantage of competition.

"This amendment shall not be applicable to any agreement, policy, contract, bond, assurance or guarantee in existence at the time of the effective date of this amendment."

This action was filed by appellee for a declaration of rights under the 1938 amendment and for an injunction against the Commonwealth's Attorney and the Director of Insurance to restrain them from interfering with appellee's business. The chancellor held that the 1938 amendment did not apply to appellee's contract but, that, if it did, it was unconstitutional and void. He granted the injunction prayed and this appeal followed.

In Swindler v. Kenton & Campbell, Benevolent Burial Association, 275 Ky. 666, 122 S. W. (2d) 506, the 1938 Amendment was mentioned but was held not to be applicable to that case. In the Swindler case, however, the Court referred to the amendment as making it unlawful to provide for payments to an official undertaker. A careful reading of the 1938 amendment indicates, of course, that it is unlawful only to limit payments to a designated undertaker *"so as to deprive the personal representative or family of the deceased from, or in any way, to control them in, procuring and purchasing supplies and services incident to the burial of the deceased, in the open market, with the advantage of competition."*

The result of the 1938 amendment is not per se to prohibit the naming of official undertakers. Had this been its purpose, certainly the Legislature could, and no doubt would, have employed language less involved than that used. We are thus left with the problem (1) whether or not the amendment was intended to cover a situation such as is presented by appellee's certificate and (2) whether or not the amendment is within the legislative power under the Constitution.

In Robbins v. Hennessey, 86 Ohio St. 181, 99 N. E. 319, 320, an intermediate court held constitutional an Ohio statute from which the 1938 amendment was quite obviously taken. Indeed, appellant states in his brief

that the Kentucky act was copied from the Ohio statute with the Robbins decision in view. The court there said:

"Whatever may have been the abuses against which the provisions of this act were directed, it clearly appears from the act itself that the General Assembly of Ohio considered these contracts to be in restraint of trade, and therefore against public policy, and sought to prevent the making of all such contracts, except as they might be expressly authorized by statute."

It was recognized in that case "that the insurance company, having been granted the right and the franchise of writing contracts of insurance in this state, is subject to the control of the state, not only as to the nature of the business it may do, but also as to the form of contract it may make."

We cannot construe the 1938 amendment in a vacuum. It must be read in connection with the previous amendments to the burial association laws and the previous decisions of this Court thereunder. In Schultz, Superintendent, v. Ohio County, 226 Ky. 633, 11 S. W. (2d) 702, 704, we said:

"The intention of the Legislature in enacting a law must be the controlling factor in its construction and interpretation (Section 459, Statutes), and where there is doubt as to the meaning of such laws the courts may look to 'the historical setting surrounding its enactment; the public policy of the state; the condition of its laws; the habits and manners of its people; and all other prior and contemporaneous facts and circumstances that throw intelligent light of the intention of the lawmaking body.' Sewell v. Bennett, 187 Ky. 626, 220 S. W. 517; Commonwealth v. Barnett, 196 Ky. 731, 245 S. W. 874."

In Kenton & Campbell Benevolent Burial Association v. Quinn, supra, we held that the *contract* between the burial association and its members did not transgress the provisions of the law, requiring such association to make all payments in cash, merely because it limited the agreement to pay to nine official undertakers. We concluded that the field of choice was sufficiently broad "to render it unobjectionable under the act." There was no question there of "*in any way*" controlling the selection of supplies and services by the representatives of the deceased member. It is apparent that

the 1938 amendment was designed to meet the Quinn decision—as much so as if the Legislature had said in so many words, "We think the limitation of cash payments to any number of official undertakers interferes with the freedom of choice of the representatives of deceased members and we therefore declare it to be void." The circumstances of the enactment and the history of the legislation all indicate that the Legislature must have thought that the designation of an exclusive group to whom payments would be made was an evil no matter whether the number composing the group was large or small. To construe the amendment otherwise would be, in effect, to deny it all efficacy for the act as construed in the Quinn case already reached the manner of payment and required a substantial number of "official undertakers" to be named. Whether or not there is anything in the Constitution to prohibit the Legislature from thus requiring cash payments to any undertaker who was selected rather than to the limited class designated by the association is another matter. So far as the present question is concerned we think it certain that the intent of the 1938 amendment was to reach and prohibit the very contract here involved. It follows that the chancellor erred in holding that the act did not apply to appellee's certificates.

We are thus brought face to face with appellee's second contention, namely, that the 1938 amendment is unconstitutional.

It is argued that the 1938 amendment destroys the very inducement around which burial associations are constructed. The essential element is that the cost of *a respectable burial* shall be guaranteed to the member. Ordinary industrial insurance does not offer this guarantee because the mere payment of a sum of money, whatever the purpose of its accumulation, gives no assurance to the member that the fund will be used exclusively, or at all, to provide a respectable burial. Even a provision that the sum of money would be paid only to an undertaker would not thoroughly meet the situation for there is no way in which the member could be assured that undertakers not under contract to the burial association would furnish the services and supplies prescribed in the certificate for the price fixed. Nor is it any answer that the association can still contract with "official undertakers" to perform the required services if the representatives of the deceased prefer them to

some outside undertaker. It is the guarantee *to the member* himself, that he will receive a respectable burial that is the inducement to the membership. This was pointed out in the Quinn case. Plainly this guarantee is wholly illusory if the deceased member's representatives may select any undertaker they choose, who may furnish the equivalent of the services and supplies fixed in the certificate but who may not.

We are not impressed with the statement of the Ohio court in Robbins v. Hennessey, supra, that the general assembly of that state considered these contracts to be in restraint of trade and therefore against public policy. Had this been the actuating motive it seems patent that the legislature would have approached the question from an entirely different angle. The monopoly feature could be easily met, for example, by the simple process of requiring that undertakers who gave the required security and agreement should thereby become entitled to status as "official undertakers." Thus any possibility of unreasonable restraint of trade as between undertakers would be eliminated. Of course, the fact that the legislature may have chosen one method of dealing with a question rather than another that might seem to us to be a more logical or efficacious means of procedure is not conclusive. But it is certainly a "straw in the wind." It is common knowledge that the supplies and services provided for in the membership certificates are priced lower therein than the usual charge to outsiders and there is at least the shadow of suspicion that undertakers not named as official may feel more interest in destroying this arrangement than in joining the organization.

It is difficult to reach any other conclusion than that the real intent and purpose of the 1938 amendment was to deal a death blow to all burial associations by striking at the one feature which differentiates them from ordinary industrial insurance. We can discover nothing tending toward monopoly in the guarantee of a respectable burial in apparently the only way appellee can do it. Nor do we find any other objection within the realm of judicial notice which seems remotely to justify the attempted "regulation." Strangely enough, the very same legislature which enacted the law before us likewise passed a bill to provide for "hospital service corporations" to be organized exactly like the burial associations. See chapter 23, Acts 1938 (Kentucky Stat-

utes Supp. 1938, Section 2089L-1 et seq.). Surely there can be, therefore, no legislative objection to the principle involved. It is not for us, of course, to substitute our judgment for that of the Legislature in the declaration of public policy or in the regulation of occupations affected with a public interest. However, the determination of the Legislature as to these matters "is not conclusive, but is subject to the supervision of the courts." Ware v. Ammon, 212 Ky. 152, 278 S. W. 593, 595; Rawles v. Jenkins, 212 Ky. 287, 279 S. W. 350; Lawton v. Stewart Dry Goods Company, 197 Ky. 394, 247 S W. 14, 26 A. L. R. 686. As said in Ware v. Ammons, supra:

> "The rule is that, in order to sustain legislative interference with the business of the citizen, the court must be able to see that the act tends in some degree to promote the public health, morals, safety or welfare. In every case the means adopted must be reasonably necessary to accomplish that purpose, and should not be unduly oppressive upon the citizen."

Regulatory legislation must have some real relationship to the purpose sought to be accomplished (Lawton v. Stewart Dry Goods Company, supra) and the purpose to be accomplished must be regulatory and not prohibitive of a lawful occupation. A bye or sinister objective may not be attained under color of regulation that will not stand an examination of its basis.

The very essence of appellee's existence is the right to guarantee to its members "a respectable burial," not simply a sum of money. This is the one feature which distinguishes the occupation from all others. Certainly, there is nothing unlawful or contrary to any conceivable public policy in the prosecution of this business. Howsoever much it may be affected with a public interest it cannot be arbitrarily emasculated.

As we have seen, the necessary effect of the 1938 amendment is to destroy this one distinguishing characteristic of the appellee's business, and, to all intents and purposes, to make of it a mere industrial insurance company. The amendment passes the bounds of regulation and becomes mere prohibition.

It is an arbitrary and unreasonable restriction upon a lawful occupation and it is, therefore, void.

Judgment affirmed.

Whole Court sitting.

NOTE.—The sections of the membership certificate pertinent to this proceeding provide:

"4. It is the purpose and object of this Association to provide means for a respectable burial of its members. The Association undertakes to do this by guaranteeing and paying in money the cost of such burial. It does not, and will not, in any case, furnish the merchandise or service required for such purpose, but it will pay in money to the person, firm or corporation designated to receive same, as hereinafter provided, the sum of One Hundred and Fifty ($150.00) Dollars in the case of members five years of age or over; the sum of Seventy-Five ($75.00) Dollars in the case of members six months to five years of age; and Fifty ($50.00) Dollars in the case of members or persons under six months of age.

"5. The Association, for the use and benefit of its members, has taken and will at all times maintain with corporate security authorized to do business in the State of Kentucky, an obligation, contract or bond from the Funeral Directors or Undertakers designated by it, and whose names are or may be printed or written on the back of this certificate, requiring that for the price or consideration herein mentioned, to furnish for the deceased member the following merchandise, equipment and services.

"For persons under six months of age—white plush casket, box, one six passenger limousine, door wreath and professional services.

"For persons six months to five years of age— white plush casket, box, auto hearse, two six passenger limousines, door wreath and professional services.

"For persons five years of age and upwards to any age—plush or velvet casket of any color, box, auto hearse, two six passenger limousines, burial garment, door wreath and professional services.

"6. Should other or additional merchandise or service than herein described and provided for be desired, the official undertaker having the funeral in charge and furnishing such other and additional service or merchandise, shall render an itemized

statement to the certificate holder of all service and merchandise furnished by him, and shall give or allow because of the merchandise and service herein required to be furnished, a credit of $50.00 in the case of a person under six months of age; $75.00 in case of a person of ages six months to five years; and $150.00 for persons five years of age and upwards.

"7. Should the death of the member occur while resident outside the City of Cincinnati in the State of Ohio or outside Kenton or Campbell Counties in the State of Kentucky, the Funeral Director or Undertaker called upon by those having charge of such member or of his remains, shall provide the merchandise and service herein specified through some other Undertaker located at the place of the death of such member, or he may pay the money received from the Association to such person or persons having charge of such member or of his remains.

"8. This Association will pay the benefit herein provided for in money only, to such one of the Funeral Directors or Undertakers appointed by it and named on this certificate, as the member or after his or her death, those nearest in relationship to, or caring for, or in charge of such member or his remains, may select, and it will not pay such benefit to any other person whomsoever. The production of a receipt signed by such Funeral Director or Undertaker shall be conclusive evidence that all claims under this certificate have been paid and satisfied.

"9. The Funeral Directors or Undertakers designated and bonded by the Association have been selected for the purpose of guaranteeing satisfactory services to its members; but they are subject to change by the Association whenever, in the judgment of the Board of Directors, such change is desirable or required, and in the event that such a change is made, it will be noted or indorsed on the member's certificate, and he will thereafter abide and conform thereto.

"10. When a member dies, those nearest in relation to, or any one caring for, or in charge of said member, or of his remains, may present to any one

of the Undertakers designated hereon or herein, this certificate, together with the pass or dues book, showing that the dues to the Association have been paid up to the time of the death of such member, and such Undertaker is obligated to the Association and to the member to at once take charge of and furnish the burial contemplated and provided for herein."